KACT, INC., & another[1] *vs.* MARK RUBIN & others,[2] trustees.[3]

No. 03-P-656.

Suffolk. April 14, 2004. - December 21, 2004.

Present: GELINAS, SMITH, & TRAINOR, JJ.

*Condominiums,* Master deed of trust. *Consumer Protection Act,* Sale of condominium unit. *Contract,* Interference with contractual relations, Performance and breach, Waiver. *Trust,* Breach of trust. *Unlawful Interference. Waiver.*

In a civil action by the owners of commercial condominium units and a restaurant business alleging that the actions of the defendant trustees of the condominium trust caused the plaintiffs to lose the potential sale of their units and business, the judge did not err in determining that the plaintiffs had waived their right to object to certain condominium rules and regulations proposed by the trustees for the proposed new owner's use of the premises should the sale be consummated, where the plaintiffs acquiesced in deviations from the condominium master deed and by-laws by entering into a previous agreement regarding the operation of the restaurant and by the plaintiffs' actions throughout the nine-year period during which that agreement governed [694-697]; moreover, the judge properly dismissed the count of the complaint alleging tortious interference with contractual relations, where the trustees had acted to address the legitimate concerns of the other unit owners, and therefore, the plaintiffs did not sustain their burden of showing that the trustees' conduct was wrongful or improper in motive or means [697-700].

CIVIL ACTION commenced in the Superior Court Department on December 15, 1999.

A motion for summary judgment was heard by *Geraldine S. Hines*, J., and the case was heard by *Linda E. Giles*, J.

*Lawrence G. Green* (*John R. Mayer* with him) for the plaintiffs.

*Joseph R. Valle, Jr.,* for the defendants.

---

[1] Paul Glinski, trustee of the Vendome Restaurant Realty Trust.

[2] George Jedlin and Arthur D. Pinkham, Jr.

[3] Of the Vendome Condominium Trust.

GELINAS, J. Claiming that actions by the defendants, trustees of the Vendome Condominium Trust (trust), had caused them to lose the potential sale of their commercial condominium units (units) and their restaurant business to the Briar Group (Briar), KACT, Inc., operator of Spasso's Restaurant (Spasso's or the restaurant), and Paul Glinski, as trustee of the Vendome Restaurant Realty Trust, which owned the units (collectively plaintiffs), brought action against the defendants (hereinafter trustees), alleging breach of the condominium trust instrument (count I), tortious interference with contract (count II), tortious interference with advantageous relations (count III), and violation of G. L. c. 93A (count IV).

On the trustees' motion for summary judgment, a judge in the Superior Court allowed the motion as to the c. 93A claim. The plaintiffs voluntarily dismissed count III (interference with advantageous relations), and the matter proceeded to a jury-waived trial on counts I and II before a different Superior Court judge. Judgment entered in favor of the trustees. The plaintiffs filed a motion to alter or amend the judgment, which was denied. This appeal followed.

The trial judge made extensive findings of fact and rulings of law. The plaintiffs do not challenge her findings of fact, and from our review of the record, they are amply supported by the evidence.

As a preliminary matter, the trustees claim that the appeal should be dismissed, arguing that the plaintiffs' brief initially did not conform to the Massachusetts Rules of Appellate Procedure, and that the plaintiffs failed to pay the required fee. These violations of the rules were cured almost immediately.

The trustees also claim that the plaintiffs failed to (1) notify the trustees in advance of the issues they sought to submit for review; (2) designate those portions of the record on which they intended to rely, thus depriving the trustees of an opportunity to respond or to designate materials of their own; and (3) include in their appendix those parts of the record that are essential for review of the issues raised on appeal, including portions of the trial transcript.

It is clear that the plaintiffs violated several of the rules of appellate procedure in compiling their brief and appendix, but

ultimately the necessary information made its way into the record on appeal. We do not condone the actions of the plaintiffs in this regard, but conclude that the violations were not sufficiently egregious to require dismissal of the appeal on these grounds. The parties have now identified and briefed all issues on which appeal is claimed, and identified those portions of the record on which they rely for support for their respective positions. "In recognition of the severity and finality of a dismissal of an appeal, the decisional law has tempered justice with mercy and accorded to appellants considerable leeway in repairing the consequences of their procedural errors." *Points East, Inc.* v. *City Council of Gloucester,* 15 Mass. App. Ct. 722, 724 (1983). We will proceed to a consideration of the merits.

Substantively, the plaintiffs first challenge the trial judge's determination that they waived their right to object to certain condominium rules and regulations proposed by the trustees, which the plaintiffs claim to be unlawful and unenforceable. They also challenge her ruling that the trustees acted reasonably in proposing rules and regulations that the plaintiffs claim to be facially unenforceable under current law.

They further claim error in the trial judge's determination that the trustees did not use "improper means" to interfere with the plaintiffs' contractual relationship with Briar, where the proposed rules and regulations were facially unlawful. Finally, the plaintiffs claim error in the grant of summary judgment dismissing their G. L. c. 93A claim. We affirm.

*Facts.* We summarize the trial judge's findings of fact, supplementing these findings with undisputed material of record where necessary, and reserving some details for later discussion.

The Vendome Condominium (condominium), a mixed-use commercial and residential condominium, was created by master deed in January of 1975. The master deed expressly permits the operation of a restaurant in designated commercial units.

The trust was created by trust instrument, and constitutes the organization of unit owners, as provided by G. L. c. 183A, § 10. Article V of the trust instrument sets forth by-laws for governance of the condominium. Adoption of administrative rules and regulations is authorized by section 5.6 of the by-laws. As part of the plan for governance of the commercial

areas, the by-laws require that the trustees appoint a usage committee consisting of seven members, three of whom are to be nominated by the owners of the commercial units, three by the residential unit owners, and the seventh to be selected by agreement of these six or, if there is no agreement, by the president of the Greater Boston Real Estate Board.

The usage committee is vested with authority to

"make administrative rules and regulations, policies and decisions for the harmonious and mutually beneficial use of the commercial areas of the Building including but not limited to:

"(i)     Establishing uniform sign criteria, including prescription of standard sign colors, scripts and sizes.

"(ii)    Allocation of cleaning responsibilities.

"(iii)   Methods of waste disposal.

"(iv)    Methods and locations of delivery.

"(v)     Minimum and maximum hours of operation.

"(vi)    Nature of permitted occupancy. . . . [T]he Usage Committee may approve or disapprove a commercial occupancy on the basis of whether it would tend to diminish the calibre of usage of the Lower and Upper Concourse by reason of noise, odor, or merchandise or method of operation not harmonious with high quality commercial usage. Competition with existing uses shall not be a basis for disapproving a proposed occupancy.

"(vii)   Advertising.

"(viii)  Special charges for or requiring separate metering for a use requiring more than routine quantities of water.

"(ix)    Decor of common areas in the Lower and Upper Concourse."

These are the only regulations governing the internal operation of commercial units. Up to the time pertinent to events in this case, a usage committee had not been appointed.

The trust instrument, including the by-laws, may be amended only with the consent in writing of unit owners entitled to not less than seventy-five percent of the beneficial interest in the condominium.

Spasso's began operation in June of 1991 as a full service bar and neighborhood restaurant serving northern Italian cuisine in a casual environment. Its entertainment license permitted live instrumental music, limited to three unamplified instruments. The restaurant contained three television sets and a jukebox in the bar.

The restaurant's relationship with the condominium was controlled by an agreement between the plaintiffs and the trustees, signed in June of 1991 (the 1991 agreement). The agreement covered such activities as the cleaning of common areas, regulation of smoke and restaurant odors, loitering by customers and employees in common areas, pest and rubbish removal, deliveries, and restrictions on entertainment. The agreement contained language indicating that Spasso's desired to be a "fine dining" restaurant. The restaurant operated under the 1991 agreement until 1999 with minimal complaint from the trustees or their management company, and Spasso's addressed any complaints that were raised.

In 1998, the plaintiffs determined to sell Spasso's and their commercial condominium units. Briar, an operator of several Irish-themed establishments, became interested. In March of 1999, the plaintiffs entered into a purchase and sale agreement with Briar for the sale of Spasso's and the units. The agreement provided that Briar had sixty days to obtain all necessary licenses, permits, and approvals, including approval from the "Trustees of the Vendome Condominium Trust and the Usage Committee" for Briar's intended use of the premises. Absent the necessary licenses and approvals, Briar was entitled to opt out of the purchase.

After soliciting comment from the condominium owners concerning the proposed sale to Briar, the trustees, through their attorney, requested assurances from Briar that the proposed business would actually be a fine dining restaurant, and not just

a pub. The trustees' attorney also suggested that the existing agreement and rules governing Spasso's would serve as a "baseline" for Briar's operation.

Additional correspondence followed between the trustees' attorney and Briar. A "draft" set of "Conditions for Use and Rules and Regulations" for the operation of the new restaurant was sent to Briar. The draft included conditions that the new restaurant operate as a "fine dining" restaurant with a seventy percent to thirty percent food to beverage ratio; that the trust be able to audit the new restaurant's business records to verify the ratio; that there be no smoking or music[4] (other than ambient or background music) in the new restaurant; that the hours of terrace use be reduced; and that there be a $300 per violation per day fine.

These conditions were not acceptable to Briar, as they were not consonant with the type of Irish pub establishment it intended to operate. Briar notified the plaintiffs that Briar would opt out of the agreement, citing its inability to obtain (1) all necessary licences, permits, and approvals required for the restaurant's operation; and (2) the approval of the trustees and the usage committee for the intended use of the premises. At trial, Briar indicated that it would have "stayed the course" with respect to licensure had the conditions been more reasonable.

In 2001, the plaintiffs sold the restaurant and the units to another group for $377,500 less than the amount offered by Briar. Although the purchase and sale agreement was signed in 2000, the sale was delayed for one year due to difficulties in obtaining approval for transfer of the liquor license. The plaintiffs claimed total damages of $738,353. This included the $377,500 differential plus damages for additional fees, taxes, and operating costs incurred in the time between Briar's opting out and the actual sale of the property.

*Discussion. Count I.* The plaintiffs argue that the trial judge erred in ruling that they waived their right to object to the condominium rules proposed by the trustees for Briar's use of the premises, should the sale be consummated, and in her ruling

---

[4]At the time of negotiation, both activities required that Briar obtain a variance.

that the trustees acted reasonably by proposing the rules and regulations. There was no error. The trial judge first recognized that any restrictions governing owners' internal use of their units should have been incorporated in the master deed, see G. L. c. 183A, § 8(*g*), or, if the restrictions were "designed to prevent unreasonable interference with the use of . . . [the] units," then in the by-laws, see G. L. c. 183A, § 11(*e*); *Granby Heights Assn.* v. *Dean*, 38 Mass. App. Ct. 266, 268 (1995). She further recognized that rules and regulations not sufficiently incorporated into the by-laws cannot be considered to be by-laws. See *Johnson* v. *Keith*, 368 Mass. 316, 320 (1975). In the case of this condominium, adoption of a by-law required a vote of seventy-five percent of the unit owners, and no such vote accompanied the rules proposed with respect to Briar's use of the units.

The judge further recognized that under the terms of the condominium documents, a usage committee to develop rules and regulations concerning use of the commercial units, with commercial owner representation, should have been formed, and was not. The trial judge ruled, however, that the plaintiffs had "acquiesced in these purported grievances" during the period of their ownership and occupancy, thus waiving any claimed breach of the condominium documents by the trustees. We agree.

Waiver may occur by an express and affirmative act, or may be inferred by a party's conduct, where the conduct is "consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible." *Attorney Gen.* v. *Industrial Natl. Bank*, 380 Mass. 533, 536 n.4 (1980), quoting from *Buffum* v. *Chase Natl. Bank*, 192 F.2d 58, 60-61 (7th Cir. 1951), cert. denied, 342 U.S. 944 (1952). Here, where waiver is not explicit, it must be premised on "clear, decisive and unequivocal conduct," *Glynn* v. *Gloucester*, 9 Mass. App. Ct. 454, 462 (1980), indicating that the plaintiffs intended to waive both the provisions of the statute regarding rules governing the internal use of the units and the provisions in the condominium documents requiring establishment of the usage committee. Whether waiver exists is a question of fact, and a finding of

waiver will not be reversed unless it is plainly wrong. *American Oil Co.* v. *Katsikas*, 1 Mass. App. Ct. 437, 440 (1973).

Other States have recognized waiver of condominium provisions contained in both statute and by-law. See, e.g., *Northwoods Condominium Owners' Assn.* v. *Arnold*, 147 Ohio App. 3d 343, 348 (2002) (unit owner waived any right to raise defense that pet restriction was illegally adopted). See also *Breene* v. *Plaza Tower Assn.*, 310 N.W.2d 730, 734 (N.D. 1981) (benefits of statutory provisions relating to condominiums may be waived, provided there is "knowledge of the rights intended to be waived and a voluntary and intentional relinquishment of those known rights").

The plaintiffs argue that they merely remained silent in the face of the trustees' promulgation of rules affecting the use of their units, and of the common areas, in connection with the operation of Spasso's. We disagree. By entering into the 1991 agreement governing the operation of the restaurant, and by their actions throughout the nine-year period during which the agreement governed, including responding to complaints regarding odors and food handling, the plaintiffs did more than remain silent.

The plaintiffs contend as well that they could not waive the provisions of the condominium statute, as any such waiver would violate the public policy behind G. L. c. 183A. Where the statute's purpose is the "protection of the property rights of individual parties . . . rather than . . . the protection of the general public," waiver of statutory rights is permissible. *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 378 (1990), quoting from *Continental Corp.* v. *Gowdy*, 283 Mass. 204, 218 (1933). Here, the provisions of G. L. c. 183A in this regard clearly go to the protection of the property rights of the individual condominium unit owners, and not to the general public, and waiver is not barred as contravening public policy.

Further, the plaintiffs raised no challenge to the validity of either the 1991 agreement or the trustees' proposed rules prior to this litigation. The record offers no theory or evidence to suggest that the 1991 agreement, and the rules thereunder, caused the plaintiffs any loss. As to the proposed rules, they were never promulgated, but were, as the trial judge found,

draft suggestions for discussion only. Although the judge found that Briar could "opt out" of the agreement absent "approval of the Trustees and the Usage Committee" at the times in question, neither the plaintiffs nor Briar raised any objection to the proposed rules based on the fact that no usage committee had been appointed, or that the rules were proposed by the trustees, even when the attorney for the trustees indicated in correspondence that the trustees were "acting as the usage committee." There was no error in the trial judge's ruling that the plaintiffs waived objection to the trustees acting to propose rules, or in the dismissal of count I of the plaintiffs' complaint.

*Count II.* The plaintiffs also claim error with respect to the dismissal of count II of the complaint, alleging tortious interference with contractual relations. We affirm.

To maintain an action founded on the intentional tort of interference with contractual relations, the plaintiffs were required to establish (1) the existence of a contract with a third party that contemplated economic benefit; (2) that the trustees knowingly induced the third party to break the contract; (3) that the trustees' conduct, in addition to being intentional, was wrongful or improper in motive or means; and (4) that the plaintiffs sustained damage as a result of the trustees' actions. See *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992), and cases cited; *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 397 (1996).[5]

The trial judge ruled that the plaintiffs had met their burden of proof as to three of the four elements, viz., establishing that there existed a contract with a third party from which they anticipated economic benefit, that the trustees knowingly induced the third party to break the contract, and that the plaintiffs sustained damage thereby.

The trustees urge that the trial judge erred in finding the existence of a contract, as the contract was one for the sale of real estate, was never breached, and was by its terms subject to Briar's option to terminate upon certain conditions. We disagree. The purchase and sale agreement was comprehensive and was a

---

[5]For a concise history of the development of this species of tort, and an opinion as to its potential development, see *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.*, 283 Or. 201, 204-207 (1978).

binding contract, even though Briar might be relieved of performance if certain conditions of the contract were not met. See *Yiakas* v. *Savoy*, 26 Mass. App. Ct. 310, 313 (1988) (binding contract formed once both parties signed comprehensive purchase and sale agreement even though one party might be relieved of performance if condition in contract was not fulfilled). The trial judge's finding in this regard was correct.

The judge ruled, however, that the trustees had acted to address the legitimate concerns of the other unit owners, and thus the plaintiffs had not sustained their burden of showing that the trustees' conduct was wrongful or improper in motive or means. Further, she ruled that the trustees had not singled out Briar in proposing the 1999 rules, as the trustees imposed virtually the same rules on the plaintiffs' ultimate successor. ·

With respect to this element, the plaintiffs were required to demonstrate more than intentional interference with the contractual relationship; their burden was to show that the interference was improper by some measure beyond the fact of interference itself, and that the trustees' conduct was either governed by improper motives, or that the means used were improper. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816-817 (1990), and cases cited.

The plaintiffs do not claim that there was actual malice, that is, a "malignant purpose" to injure either the plaintiffs or Briar "unrelated to [a] legitimate . . . interest," *King* v. *Driscoll*, 418 Mass. 576, 587 (1994), *S.C.*, 424 Mass. 1 (1996), quoting from *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992), and we find ample record support for the trial judge's finding that the motive directing the trustees' action in proposing the 1999 rules was to protect the unit owners and to respond to the expressed concern of some regarding the nature of Briar's business. "Generally, the propriety of the [defendants'] motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis." *Adcom Prods., Inc.* v. *Konica Bus. Machs. USA, Inc.*, 41 Mass. App. Ct. 101, 105 (1996).

The plaintiffs assert, correctly in our view, that with respect to establishing improper conduct on the part of the trustees, they may show that either the trustees' motives or the means

used by the trustees were improper, but that the plaintiffs need not show both. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 816-817.

The plaintiffs argue principally that the trustees used improper means in their interference. They contend that in proposing the 1999 draft rules, the trustees exceeded their lawful powers under the trust documents, that the draft rules were in violation of a statute, i.e., G. L. c. 183A, and that, on authority of *United Truck Leasing Corp.* v. *Geltman*, *supra* at 817, a violation of the statute or common-law rule constitutes improper means. We hold that not every such violation constitutes improper means; even when there is a violation of statute or common law rule, there must be a case-by-case evaluation, and resort may be had to the factors set forth in § 767 of the Restatement (Second) of Torts (1979) to determine whether the violation constituted an improper means. In this case, even though proposal of the 1999 rules may have been in excess of the trustees' authority and in contravention of G. L. c. 183A, proposing the rules did not constitute improper means.

Generally, the propriety of the motive and means depends on the totality of circumstances surrounding the actions taken. See *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 273 (1991) ("The propriety of an actor's motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis. The same generally holds true for the evaluation of the means that an actor relies on to achieve a goal"). Section 767 of the Restatement (Second) of Torts sets forth a number of factors that might be considered in determining whether a defendant's conduct in intentionally interfering with a contract (or a prospective contractual relation) is improper: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Section 767 does not exhaust the list of possible factors. See *id.* at comment b.

We have acknowledged use of these factors in considering whether improper means were used in contract interference where there was no finding of a statutory violation. *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 752 (1993). In the instant matter, we think § 767(a), "the nature of the actor's conduct," and § 767(g), "the relations between the parties," particularly instructive. As noted, the statute in question, G. L. c. 183A, has as its purpose the protection of the private property of the unit owners. As the trial judge found, the trustees were acting to protect the interests of the other unit owners, a motive closely paralleling the protections offered by the statute. Further, in proposing the 1999 rules, the trustees simply were following precedent established in their prior dealings with the plaintiffs, conduct in which the plaintiffs had acquiesced. The plaintiffs held title to two of the condominium units and were, or should have been, intimately familiar with the terms of the master deed and the by-laws, including the requirement that a usage committee be established to deal with issues involving owners who used their units for commercial purposes. The plaintiffs had waived any violation of the statute, as well as any violation of the provisions of the master deed and by-laws. Given the relationship of the parties on this issue, any violation of the statute, or of the provisions of the condominium documents, at least as to the plaintiffs, did not amount to improper means. The trial judge was correct in her ruling that the plaintiffs had not shown that the trustees' conduct was improper, either in motive or means.

*Count IV.* As to the plaintiffs' claim of error in the grant of summary judgment on count IV of the complaint, alleging violation of G. L. c. 93A, we conclude that based on the summary judgment materials, the plaintiffs had no hope of proving that the trustees were engaged in trade or commerce as those terms are defined in the statute, an essential element requiring proof at trial. Summary judgment was properly granted.

*Judgment affirmed.*